# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

KETTY GONZALES,
o/b/o M.A.N.,

                                    **Plaintiff,**

**-vs-**                                    **Case No.  6:04-cv-1795-Orl-KRS**

COMMISSIONER OF SOCIAL
SECURITY,

                                    **Defendant.**

_____

## ORDER

This cause came on for consideration without oral argument on the Complaint

filed by Ketty Gonzales on behalf of her son, Miguel, seeking review of the final decision

of the Commissioner of Social Security denying her claim for social security disability

benefits.  Doc. No. 1.  The Commissioner answered the Complaint and filed a certified

copy of the transcript of the proceedings before the Social Security Administration (SSA).

Doc. Nos. 9, 10.  Pursuant to the consent of the parties, this matter has been referred to

me for disposition under 28 U.S.C. § 636(c).  Doc. Nos. 12, 13.

## I.      PROCEDURAL HISTORY.

On November 15, 2002, Gonzales filed an application for disability benefits under

the Supplemental Security Income for the Aged, Blind, and Disabled Program (SSI), 42

U.S.C. § 1382, *et seq*., alleging that Miguel was disabled as of August 1, 1996, shortly

before his third birthday.[1]  R. 67-70.  Gonzales's claim was denied initially and upon reconsideration.   R. 56-60.

Gonzales requested a hearing before an administrative law judge (ALJ), R. 61, which was held on April 5, 2004. Gonzales had a nonattorney representative at the hearing.  Gonzales and Miguel both testified at the hearing.  R. 23-48.

After considering the testimony and medical evidence presented, the ALJ found that Miguel had not engaged in any substantial gainful activity. The ALJ concluded that the medical evidence indicated that Miguel suffered from Attention Deficit Hyperactivity Disorder (ADHD) and had a learning disability, which were severe impairments.  R.  16.

---

[1]      A previous application was filed August 13, 1996.  R. 16.  It was approved and Miguel received benefits.  *Id*.  When Miguel moved to Puerto Rico in November 1998, his benefits ceased.  *Id*.  The family returned to the United States on October 16, 2002, and the present application was filed effective November 15, 2002, Miguel's thirty-first day of residency.  R. 16, 67.

In her memorandum of law, Gonzales seems to question whether the applicable standard to evaluate the November 15, 2002, application is that used in the case of termination of benefits, rather than the standard applicable to initial disability applications. The pertinent statutes and regulations provide that an individual loses eligibility for SSI benefits for any time during which he is out of the United States, which is defined as the fifty states, the District of Columbia and the Northern Mariana Islands.  20 C.F.R. § 416.215.  If the claimant has been outside the United States for twelve consecutive months, the SSA terminates the claimant's eligibility for SSI benefits.  20 C.F.R. § 416.1335.  Thereafter, the claimant must reapply for benefits or file a request for reinstatement of benefits.  42 U.S.C. § 1383(j)(1)(B).  Because Gonzales filed a new application, rather than a request for reinstatement of benefits, it appears that the appropriate procedure is to evaluate the November 15, 2002, application using the standard applicable to initial disability applications filed on behalf of children.  *See* Doc. No. 25.

The ALJ determined that Miguel's impairments did not meet or medically equal the criteria for any of the impairments listed in the applicable social security regulations.[2]  *Id.*

Because the ALJ concluded that Miguel's impairments did not meet any of the listed impairments, he proceeded to address whether Miguel's impairments were functionally equivalent to the listings under six domains of function, which are as follows: (i) acquiring and  using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for yourself; and (vi) health and physical well-being.[3]  R. 18-21.  In considering functional equivalency, the ALJ did not give a great deal of weight to the opinions of Miguel's teachers about the degree of his limitations in various areas because the teachers' comments were not on official SSA forms and were not based on the standards the SSA uses to determine the degree of functional limitations in various domains.  R. 16.

The ALJ made the following findings under each domain.

(i) **Acquiring and Using Information**. The ALJ found that Miguel had marked limitations in this domain. In support of this finding, he stated as follows:

> The Speech/Language examination indicated severe limitations in both receptive and expressive language (Exhibit 3F).  The child is in special education classes and requires extensive assistance.  (Exhibit 9E).  He currently reads on a kindergarten level and is considered in the latest school report

---

[2]     The Code of Federal Regulations "contains a Listing of Impairments specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories."  *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004).

[3]     *See* 20 C.F.R. § 416.926a(b)(1).

> as a non-reader.  (Exhibit 8E/20).  Overall, the weight of the
> evidence supports finding that the child has the highest level
> of limitation in this domain.

R. 19.

(ii) **Attending and Completing Tasks**.  The ALJ concluded that Miguel had less

than marked limitations in this domain.  In support of this finding, he stated as follows:

> While it is noted that the child is easily distractible and
> required continuous redirection, he does do better on
> medication.  He has been diagnosed with ADHD and
> continued to struggle with school.  However, all reported
> indicated that the child was easily re-directable and he is not
> a major behavioral problem. The weight of the evidence did
> not support a higher level of limitation in this domain.

*Id.*

(iii) **Interacting and Relating with Others**.  The ALJ found that Miguel had less

than marked limitations in this domain. In support of the finding, the ALJ wrote as

follows:

> While it was reported that the child has some difficulties with
> his siblings, especially his brother who also had ADHD, the
> teacher comments indicated that he prefers to play by
> himself, but was welcoming when others sought to join him.
> He did go through an aggressive period in September and
> October of 2003, but has settled down since then.  (Exhibit
> 9E).  The child can be disruptive at school as well.  However,
> the descriptions did not warrant a higher level of limitations as
> he responded well to adults.

*Id.*

(iv) **Moving About and Manipulating Objects**.  The ALJ concluded that Miguel

had no limitations in this domain.  *Id.*

(v) **Caring for Yourself**.  The ALJ concluded that Miguel had no limitations in this domain.  R. 20.

(vi) **Health and Physical Well-Being**.  The ALJ concluded Miguel had no limitations in this domain. *Id.*

Because the ALJ concluded that Miguel did not have an extreme limitation in any one domain, or marked limitations in two domains, the ALJ concluded that Miguel's impairments did not functionally equal any listing.  R. 21; *see* 20 C.F.R. § 416.926a(d).  As such, the ALJ concluded that Miguel was not disabled for purposes of the Act.  R. 21.

Gonzales requested review by the Appeals Council, which request was declined.  R. 4, 9-11.  This timely appeal followed.  Doc. No. 1.

## II.     JURISDICTION.

The Commissioner of the SSA issued a final decision after a hearing with respect to Gonzales's application for benefits for Miguel under SSI.  Therefore, the Court has jurisdiction over this matter under 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

## III.    STATEMENT OF FACTS.

A.      *Testimony*.

Miguel was born on August 3, 1993.  R. 67.  He has an older brother and younger sister.  R. 29.  Gonzales testified that Miguel got along well with his brother and sister, although they fought on occasion.  R. 41.

At the time of the hearing, Miguel was in the fourth grade.  R. 30.  He indicated that he was doing well in school, but Gonzales testified that he was not. R. 32, 41. Gonzales reported that Miguel did not read well and that his writing was illegible.  R. 44. Teachers told Gonzales that Miguel did not pay attention and talked to himself.  R. 46.

Miguel testified that math was his favorite subject.  He had the most trouble with art.  R. 32, 39.  He received an A+ in gym, where he performed push-ups, sit-ups and jumping jacks.  R. 39.  He occasionally received homework and sometimes needed help from Gonzales to complete it.  R. 34, 41.

Gonzales testified that teachers gave Miguel extra help in school.  R. 41, 43.  He was also in a speech therapy program.  R. 43.

Miguel testified that he had to go to the principal's office at school because other children hit him a lot.  R. 36, 38, 42.  Sometimes he hit other children as well.  R. 36.  He had been suspended from school for playing outside when he was supposed to be in school, and for fighting.  R. 36.  Gonzales testified that teachers told her that Miguel did well when he took his medication.  R. 39.

Miguel was calm when he came home from school.  R. 45.  However, as his medication wore off, he became more active.  R.  46.

Gonzales testified that Miguel got along well with children in the neighborhood.  R. 42.  Miguel testified that he had friends named Angel and John.  R. 31. He also played with his older brother.  R. 33.  When not in school, Miguel liked to play with his Playstation.  R. 33.  He also like to ride his bicycle and play tag.  R. 35. He also played catch with his father.  R. 37.

At home, Miguel had to keep his room straight and pick up his toys when asked to do so.  R. 31-32.   He also helped his mother clean other parts of the house.  R. 34.

B.    *School and Medical Records.*

Several evaluations of Miguel were performed in June 1996.  Terilu Stamper Webster, M.D., a speech and language pathologist, opined after testing that Miguel had moderately delayed language skills.  R. 194.   A nurse practitioner did not identify any health and wellness issues.  R. 196-98.  Gonzales reported during a psychosocial assessment that Miguel was progressing slowly, and that his language skills were delayed.  He was very active, and was a behavior problem at school.  R. 200.  He needed constant supervision because he played with dangerous objects, such as electrical outlets.  R. 202.

A teacher's note dated March 2, 1998, reflects that Miguel screamed and hit another child who tried to play with toys Miguel was using.  The teacher wrote that Miguel  needed simple, concrete directions, at times with physical prompting. The teacher also observed that Miguel could be "non-compliant, pouts, but can be redirected. He seems to have difficulty processing verbal directions."  R. 195.  Another individual apparently associated with Miguel's school wrote on March 9, 1998, that Miguel "ha[d] adjusted well to school routine . . [but needed] limited distractions, constant re-focusing by adults, simple directions, [and] limited information given . . . by repetition."  R. 190.

In March 1998, Wim Baars, a Certified School Psychologist, evaluated Miguel after seeing him personally on two occasions. R. 186-87.  A formal cognitive evaluation could not be performed because Miguel lacked the required concentration and

motivation for the testing.  R. 186.  Dr. Baars noted the following findings made at a May

13, 1997, school annual review:

> Miguel was described as easily distracted with little affect or
> sense of humor.  He preferred isolated play and did not like to
> be touched.  His gross motor skills were age appropriate and
> his fine motor skills were emerging.  He was impulsive,
> needed constant modeling and redirection and was very ego-
> centered.

R. 186.  Previous test results estimated Miguel's IQ to be 76.  *Id.*

Upon observation of Miguel, Dr. Baars noted that Miguel's attention span was very

short and it was difficult to refocus him.  When Miguel became tired of the testing, he

acted out and became uncooperative.  He did not respond well to prompts.  He "had his

own agenda and played in his own way."  R. 187.

Test results indicated that Miguel's global cognitive functioning was "far below

average with very weak verbal skills and borderline nonverbal abilities."  Sometimes his

speech was unintelligible.  His early number concepts were also very weak.  His

classroom teacher reported that Miguel had age appropriate self-help skills except for

avoiding dangers on occasion.  He needed to modify his behavior after verbal feedback

and comply with teacher's directions.  His primary weaknesses were in play and social

skills.  The teacher indicated that Miguel seldom appropriately expressed his emotions or

understood three-step directions.  R. 187-88.

Dr. Baars' assessment was that "[d]ue to his very short attention span, the

difficulty to re-focus him, his high activity level and his significant management needs,

Miguel appears to be learning disabled and would benefit from placement in a 12:1:1 classroom."  R. 188.

Miguel completed kindergarten and some of first grade in Rochester, New York. R. 144.   In November 1998, the family moved to Puerto Rico.  R. 16, 144.  There, Miguel repeated first grade and was "left back" in second grade.  R. 144.  He started second grade in Puerto Rico but was placed in third grade after returning to New York in October 2002.  R. 67, 144.

School records dated June 1999, reflect that Miguel was in a self-contained learning disabled bilingual classroom.  His language skills were weak in both Spanish and English, but he preferred to speak English.  R. 171-72.

Individuals whose names are illegible examined Miguel on September 7, 1999. The assessment was that Miguel had ADHD but was doing well on Ritalin.  R. 212.

An Individualized Education Program form dated November 1999, reflects that Miguel had learning disabilities in reading and math, deficits in auditory processing, a short attention span, and required constant redirection and significant management.  He was placed in a self-contained monolingual program.  R. 176-77.

Miguel A. Rivera Sanabria, M.D., wrote on October 14, 2002, that Miguel had been his patient since June 2000.  He indicated that he prescribed Ritalin and behavior therapy to treat Miguel's ADHD.  R. 208.

Individuals whose names are illegible examined Miguel on November 12, 2002. Their assessment was that Miguel had ADHD.  R. 210

In the third grade, Miguel received grades from one teacher ranging from "beginning some progress" to "making satisfactory progress" in language skills, R. 161, and from another teacher grades of B+ to D, R. 160.

In December 2002, Miguel was observed in class.  Miguel did not volunteer any answers, but the teacher indicated he did so in math. Miguel followed directions.  R. 146.

Ms. Durick, one of Miguel's special education teachers, completed a profile of Miguel in December 2002.  She indicated that Miguel's communications skills, social-emotional skills, and motor skills were below age.  His reading comprehension and decoding were below grade.   She noted that Miguel did well in math but had some trouble with language.  She wrote that Miguel sat up front by himself most of the time.  He benefitted from multi-sensory instruction, with repeated direction and consistent checks for understanding.  He needed one-to-one support with writing, sight work vocabulary development and reading.  His behavior was not a problem.  R. 134-35.

On December 18, 2002, Miguel Muñoz, a certified school psychologist, examined Miguel and administered various tests.  R. 136.  Dr. Muñoz determined that Miguel had a verbal IQ of 82, a performance IQ of 84, with a full scale IQ of 80, which put his cognitive abilities in the low average range at about the ninth percentile when compared to the norm group of children comparable in age.  Dr. Muñoz did not indicate the degree to which this score deviated from the mean.  R. 137.  Miguel had significant weakness in visual-motor integration development, visual processing speed, and visual memorization power, and significantly poor to average scores on auditory memory.  *Id.*  Teachers

reported that Miguel exhibited short attention span in the classroom and that he needed to develop positive peer relationships.  R. 138.

On December 19, 2002, Christine Windheim, a licensed speech-language pathologist examined Miguel.  On the Clinical Evaluation of Language Fundamentals - III test, Miguel scored between the first and second percentile.  R. 214.  Windheim noted that these test scores were two standard deviations below the mean.  R. 215.  Miguel ranked in the ninth percentile on the Sounds-In-Words subtest of the Goldman-Fristoe Test of Articulation.  Windheim did not indicate the extent to which these test scores deviated from the mean.  R. 215.  Windheim's assessment was that Miguel had severe receptive and expressive language delay and mild to moderate articulation delay.  R. 215.

John Thomassen, Ph.D., evaluated Miguel's nonverbal intelligence on December 20, 2002.  R. 217-21.  Dr. Thomassen wrote that Miguel did not relate well with him and was not cooperative.  R. 218.  Miguel had not been taking Ritalin at the time of this evaluation.  R. 217. Upon testing, Miguel received an IQ of 79, which placed him in the borderline range of intellectual functioning.  Miguel spoke in Spanish in an appropriate manner.  R. 218.  He was irritable and angry.  R. 219.  His attention and concentration were somewhat impaired, but his memory was mostly intact. R. 219.

Dr. Thomassen opined that Miguel might have some difficulties following directions, doing age appropriate tasks and coping with changes in his environment. Due to his cognitive abilities, he would also have some difficulties in learning and with reading, writing and performing calculations.  In addition, he was likely to have some

difficulties relating with peers and adults.  Dr. Thomassen's diagnosis was ADHD,

disruptive behavior disorder not otherwise specified, and borderline intellectual

functioning.  Dr. Thomassen's prognosis was "[f]air given the relative mildness of

[Miguel's] symptoms . . .[, but] generally guarded given his lack of involvement in

treatment and some behavioral and learning problems."  R. 220.

On January 6, 2003, Ellie Shulman, a speech-language pathologist, evaluated

Miguel.  Shulman observed that Miguel's hearing, articulation, voice, and fluency/prosody

were all within normal limits.  R. 127.  She opined that Miguel had moderate limitations in

receptive and expressive language skills and auditory skills.  R. 131.  On language skills

subtests, Miguel scored between the second and thirty-seventh percentile. Shulman did

not indicate the degree to which these scores deviated from the mean.  R. 128. Shulman

wrote that Miguel was restless, impulsive, and had difficulty sitting still, but was easily

redirected, polite and cooperative.  R. 129.  Miguel had not taken his Ritalin that

morning. *Id*.

Also in January 2003, Laura Sanchez, an academic evaluator, examined and

tested Miguel.  During the evaluation, Miguel spoke only Spanish.  R. 123.  He was

restless and had a short attention span even on medication.  He was impulsive and

fidgety and needed to be refocused.  Sanchez wrote that Miguel "was overactive for his

age and in difficulty attending to tasks."  R. 123.  Miguel scored at the kindergarten level

in reading and written language skills and at the first grade level in math.  R. 123-24.  His

scores on the Bateria Woodcock-Munoz (Spanish) test ranged from the one-tenth (.1) to

the fourth percentile.  Sanchez did not indicate the degree to which these scores

deviated from the mean.  R. 123.  These evaluations were confirmed at a Committee on

Special Education hearing later in January 2003.  R. 105.  The committee noted that

Miguel's "[a]cademics are very discrepant from his potential and ability in all areas."  *Id*.

In May 2003, Jennifer Rojas, one of Miguel's teachers, completed a school

performance questionnaire.  R. 148-59.  The form asked Rojas to rate Miguel's

functional ability in several categories.

The instructions for the form provided that a ranking of "3" would indicate marked

limitations.  Marked limitations were defined as follows:

> The degree of limitation <u>interferes seriously</u> with the child's
> ability to function - in one or several activities - independently,
> appropriately, and effectively in an age-appropriate manner
> and, when applicable, on a sustained basis.  When
> standardized tests are used, a valid score that is two or more
> standard deviations before the norm is considered "**Marked**."
> "**Marked**' may also be used to describe an impairment that is
> **more than moderate by less than extreme.**

R. 148A.  The instructions provided that a ranking of "4" would indicate extreme

limitations.  Extreme limitations were defined as follows:

> The degree of limitation <u>interferes very seriously with the
> child's ability to function</u> in an age-appropriate manner and,
> when applicable, on a sustained basis in one or several areas
> of functioning.  Three standard deviations below the norm is
> also considered extreme.  Generally speaking, a rating of
> "**Extreme**" should be **reserved for the most severe
> impairment(s) and functional deficits.**  However, "**Extreme**"
> does not mean a total loss or lack of ability to function.

*Id.*

Rojas opined that Miguel had marked limitations in the following aspects of

acquiring information: learning new material; reading and/or comprehending written

material; and comprehension and/or following oral directions.  She wrote that Miguel "requires a lot of 1:1 attention due to his distractability."  R. 149.  With respect to using information, Rojas opined that Miguel had marked limitations in all areas.  *Id.*

Rojas opined that Miguel had less than marked limitations in communication skills, moving about and manipulating objects, self-care and physical health, and completing tasks in an age-appropriate manner. R. 150-52.  With respect to interacting and relating to others, he had less than marked limitations except that Rojas opined that Miguel had a marked limitation in making and keeping friends.  R. 150-51.  She wrote that "Miguel is a loner and prefers being by himself.  Enjoys daydreaming and is very imaginative. . . . At times, he gets up and wanders and will touch everything in sight.  Will also start singing or talking to himself."  R. 151.

Rojas opined that Miguel had marked to extreme limitations in attending to tasks. Specifically, she rated his limitations as marked with respect to being easily distracted and needing frequent redirection.  She rated his limitations as extreme with respect to requiring much supervision, overactivity and restlessness and impulsivity.  She wrote as follows: "When Miguel takes his medicine he is able to do his work with minimal redirection but when he has not taken his medicine he is completely out of control.  He cannot sit still, he cannot listen, and the day is essentially wasted at school."  R. 152.

Rojas completed another evaluation of Miguel in January 2004.  She opined that Miguel had marked limitations in all aspect of acquiring information.  She wrote as follows: "Miguel requires a lot of redirection in order to complete a task.  Will lose a lot of time day dreaming."  R. 155.   She also opined that he had marked limitations in all

aspects of using information.  With respect to this opinion, she wrote as follows: "When recalling information he will leave out important parts or explain things out of sequence in an incoherent manner." *Id.*

Rojas again found that Miguel had less than marked limitations in communication skills, and no impairment in self-care and physical health.  R. 156-57.  However, she opined that he had marked limitations in fine motor skills, noting that Miguel's written letters were difficult to understand and that he had difficulty cutting.  R. 156.

Rojas opined that Miguel had less than marked to marked limitations in interacting and relating well with others.  She opined that he had marked limitations in the areas of getting along with other children and making and keeping friends.  She noted that Miguel liked to play alone, but was welcoming if someone wanted to join him.  He could be disruptive at times due to impulsivity.  He would often speak out loud, sing to himself, and leave his seat.  R. 157.  He was sent home in October for fighting with another student.  R. 158.  Rojas indicated that Miguel was doing better in this area at the time she completed the evaluation. *Id.*

With respect to attending to and completing tasks, Rojas opined that Miguel had marked to extreme limitations.  She indicated that the extreme limitations were in the following areas: needs frequent direction; carrying out instructions; frustration tolerance; maintaining age-appropriate pace; and completing tasks on time.  With respect to these findings, Rojas wrote as follows: "Miguel has a difficult time starting a task as well as completing a task which causes him to fall behind."  R. 158.    There was no indication in this evaluation that Miguel's skills improved when he took his medicine.

-15-

C.     *Reviewing Professional.*

In January 2003, Paulette Harar, M.D., completed a Childhood Disability

Evaluation at the request of SSA.  Dr. Harar opined that Miguel had marked limitations in

acquiring and using information, as shown by his IQ of 79 and language impairments.

He had less than marked limitations in the domains of attending and completing tasks,

and interacting with others.  Dr. Harar found no limitations in the other domains. R. 226-

31.

IV.     **STANDARD OF REVIEW**.

The process for determining whether a child is disabled "begins with the ALJ

determining whether the child is 'doing substantial gainful activity,' in which case [the

child] is considered 'not disabled' and is ineligible for benefits."  *Shinn*, 391 F.3d at 1278

(quoting 20 C.F.R. § 416.924(a), (b)).  "The next step is for the ALJ to consider the

child's 'physical or mental impairment(s)' to determine if [the child] has 'an impairment or

combination of impairments that is severe.'"  *Id.* (quoting 20 C.F.R. § 416.924(a), (c)).  A

"physical or mental impairment" under the terms of the Act is one that results "from

anatomical, physiological, or psychological abnormalities which can be shown by

medically acceptable clinical and laboratory diagnostic techniques . . . ."  20 C.F.R. §

416.908.

If the child has a severe impairment, "the ALJ next assesses whether the

impairment 'causes marked and severe functional limitations' for the child."  *Shinn*, 391

F.3d at 1278 (quoting 20 C.F.R. §§ 416.911(b); 416.924(d)).  Limitations arising from

pain count in this determination. *Id.* (citing 20 C.F.R.§ 416.924(a)). The impairment must

-16-

be expected to cause death or last for a continuous period of not less than 12 months. *Id*. at 1279.

"A child's impairment is recognized as causing 'marked and severe functional limitations' if those limitations 'meet[ ], medically equal[ ], or functionally equal[ ] the [L]istings.'" *Id.* at 1278 (quoting 20 C.F.R. § 416.911(b)(1); citing 20 C.F.R. §§ 416.902; 416.924(a)).  Limitations appearing in the listings are considered "marked and severe." *Id*.

If the child's impairments do not meet or equal a listed impairment, the ALJ can still conclude that the child's impairments are functionally equivalent to those in the Listings.  "In making this determination, the ALJ assesses the degree to which the child's limitations interfere with the child's normal life activities."  *Id*. The Code of Federal Regulations specifies six major domains of functioning that the ALJ should consider, namely:  (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for yourself; and (vi) health and physical well-being.  20 C.F.R. § 416.926a(b)(1). The regulations further provide benchmarks that children should have achieved by certain ages.

"A child's impairment is of listing-level severity, and so functionally equals the listings, if as a result of the limitations stemming from that impairment the child has marked limitations in two of the domains . . . , or an extreme limitation in one domain." *Shinn*, 391 F.3d at 1279 (internal quotation marks and citation omitted).  A marked limitation in a domain exists when the "impairment(s) interferes seriously with [the child's]

-17-

ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i).  An extreme limitation in a domain exists when the "impairment(s) interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i).  In considering the severity of an impairment, the Commissioner may consider the effect of treatment, including medication.  20 C.F.R. § 416.924a(b)(9)

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "'must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision.'" *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir. 1987)(quoting *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986)).  Even if the court finds that the evidence weighs against the SSA's decision, the court must affirm if the decision is supported by substantial evidence. *See Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  The court may not reweigh the evidence or substitute its own judgment, even if the court finds that the weight of the evidence is against the SSA's decision.  *Id.*  While there is a presumption in favor of the SSA's

-18-

findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988). "Failure to apply the correct legal standard is grounds not for remand, but for reversal." *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1989); *see also Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995).

**V.    ANALYSIS.**

Gonzales argues on appeal that the ALJ's determination that Miguel was not disabled is not supported by substantial evidence.  Gonzales makes four arguments under this heading: (1) that the evidence supports an extreme limitation in acquiring and using information; (2) that Miguel's limitation in attending and completing tasks was greater than "less than marked;" (3) that the ALJ improperly discounted the opinion of Miguel's teacher, Jennifer Rojas; and (4) that Miguel's limitation in interacting and relating with others was greater than "less than marked."  I will address only the first argument, because I find it to be dispositive.

The domain of acquiring and using information looks at how well a child acquires or learns information and uses the information learned.  The assessment of a child's ability in this domain changes as the child ages. *See* 20 C.F.R. § 416.926a(g)(1)(2). Generally, an extreme limitation in this domain requires a finding that the limitation "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(3).  "However, 'extreme limitation' does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the

functioning [the Commissioner] would expect to find on standardized testing with scores that are at least three standard deviations below the mean." *Id.*

The ALJ found that "the weight of the evidence supports finding that the child has the highest level of limitation" in the domain of acquiring and using information.  The highest level of limitation under the regulations is an "extreme" limitation.  Nevertheless, and despite the expressed finding that the weight of the evidence supported the highest level of limitation, the ALJ determined that Miguel had only marked functional limitations in this domain.  Thus, the ALJ's conclusion that Miguel had only marked limitations in the domain of acquiring and using information is inconsistent with his findings regarding the weight of the evidence.

Furthermore, the determination of whether a limitation is extreme depends, in part, on the determination of whether standardized test scores are at least three standard deviations below the mean. The ALJ did not discuss the actual test results in his decision.  As outlined above, some of the tests showed that Miguel scored in the bottom one-tenth of one percent of children taking the test.  Further, the ALJ did not seek information on the extent to which these test scores deviated from the mean.  Christine Windheim, a speech-language pathologist, indicated that Miguel's scores on one test were two standard deviations below the mean.  However, no other professional who tested Miguel provided a standard deviation determination.  Under these circumstances, the ALJ failed to fulfill his obligation to develop the record fully regarding the extent to which Miguel's test scores deviated from the mean.  *See Borgens ex rel. Borgens v.*

*Halter*, 164 F. Supp. 2d 1309, 1312-13 (M.D. Fla. 2001); *accord Fontenez v. Barnhart*, 195 F. Supp. 2d 1333, 1357 (M.D. Fla. 2002).

Because the record is not complete, it is not appropriate to remand the case for an award of benefits.  Rather, remand is required to permit the Commissioner to more fully develop the record and render a new decision.

## VI.    CONCLUSION.

Based on the foregoing reasons, it is **ORDERED** that the decision of the Commissioner is **REVERSED** and the case is **REMANDED** for further proceedings.  The Clerk of Court is directed to issue a judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida this 24th day of March, 2006.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Counsel of Record
Unrepresented Parties

-21-